WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Don Greene, | No. CV-14-08021-PCT-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

Pending before the Court is Plaintiff Michael Don Greene's Motion for Summary Judgment. (Doc. 41). The United States of America ("United States") filed a response, (Doc. 43), to which Mr. Greene replied, (Doc. 47). The Court now rules on the motion.

## I.    Background

The background of this case has been detailed by the Court as follows:

Mr. Greene and his former wife ("the Greenes") filed a joint 1990 tax return on or about March of 1991. (Doc. 1 at 2). The joint return was a 1040 tax return which reflected an adjusted gross income ("AGI") of $74,714.42, a taxable income of $44,968.00, and withholding credits of $9,803.76. *Id.* The Greenes reported a tax liability of $8,450.00 in the 1040 return, and received a refund of $934.00. (Doc. 13-1 at 3). Mr. Greene also filed a corporate return for the 1990 taxes of his 100% personally-owned corporation, MDG Inc. (Doc. 1 at 2).

In 1992, the Internal Revenue Service ("IRS") opened an examination of the Greenes' 1990 tax returns. (Doc. 1 at 2). The IRS completed its examination of the 1990 tax returns in 1997. *Id.* After the examination, IRS account records reflected the Greenes' 1990 AGI as [negative] $493,879.58 with a taxable income of $0.00. *Id.* The 1990 IRS examination work-papers also alleged unreported income of $888,496.75 to

MDG Inc. *Id.* at 3. The IRS issued a Statutory Notice of Deficiency reflecting a deficiency of $269,830.00, a fraud penalty of $191,939.00, and an accuracy penalty of $2,782.00. (Doc. 13-1 at 4).

The IRS determined that Mrs. Greene was not liable for the entire tax liability resulting from the 1990 Notice of Deficiency. (Doc. 13-1 at 4). Thus, the IRS assessed taxes on two separate accounts: one Joint Master File account, and one separate Non-Master File account ("NMF 1") for Mr. Greene individually. *Id.* at 4–5. An amount of approximately $202,000.00 was assessed to the Joint Master File account of Mr. and Mrs. Greene. *Id.* at 5. The remaining portion of the deficiency, approximately $350,000.00, was assessed to the separate NMF 1 account under Mr. Greene's name only. *Id.* After the IRS applied the assessment to the Joint Master File account, the IRS granted Mrs. Greene innocent spouse relief from the joint and several liability. *Id.* The full liability of the Joint Master File was then transferred to a second separate Non-Master File account ("NMF 2") against Mr. Greene only. *Id.* Thus, the liability shown on the Joint Master File account was reduced to $0.00. *Id.* After Mrs. Greene received innocent spouse relief, "Mr. Greene's liability was tracked in the two separate assessment files, NMF 1 and NMF 2." *Id.*

In 2012, the United States and Mr. Greene settled a refund suit for Mr. Greene's 1995 tax year. (Doc. 13-1 at 6). 'The liability tracked in NMF 2 was paid in full' when $170,124.00 of the settlement amount was offset against Mr. Greene's 1990 tax liability. (Doc. 17 at 5). Meanwhile, NMF 1 has an outstanding balance of $761,101.46 with more interest accruing daily. (Doc. 13-1 at 6).

Mr. Greene filed the instant suit seeking a refund for the $170,124.00 offset against NMF 2. (Doc. 1 at 5).

*Greene v. United States*, 2014 WL 6666996, at *1–2 (D. Ariz. Nov. 24, 2014); *see* (Docs. 19 at 1–2; 33 at 1–3).

On June 30, 2015, Mr. Greene filed an amended Form 1040X with the IRS and is now seeking summary judgment on his tax refund claim in the amount of $169,354.00. *See* (Docs. 46-2 at 75–76; 47 at 3). Mr. Greene made this modification because he concedes that his 1990 taxable income should be adjusted by adding certain interest income and a state income tax refund. (Doc. 38 at 8).

## II.   Legal Standard

Summary judgment is appropriate when "the movant shows that there is no

genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* at 56(c)(1). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury." (citations omitted)).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.* Notably, "[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

Finally, in a taxpayer lawsuit for a refund of tax, the taxpayer bears the burden of proving overpayment of tax. *See Watts v. United States*, 703 F.2d 346, 348 (9th Cir. 1983) (citing *Martinez v. United States*, 669 F.2d 568, 569 (9th Cir. 1981)); *Lewis v. Reynolds*, 284 U.S. 281, 283 (1932).

## III.   Analysis

In support of his motion for summary judgment, Mr. Greene sets forth five arguments. First, Mr. Greene contends that because an IRS examination work-paper stated that Mr. Greene had a 1990 taxable income of $0.00, an overpayment must necessarily exist. (Doc. 38 at 5–6). Second, Mr. Greene argues that the IRS improperly attributed $888,496.75 of income to Mr. Greene in his personal capacity despite the income being reported on the corporate tax return of Mr. Greene's solely owned and operated company, MDG, Inc. ("MDG"). (*Id.* at 6–7). Third, Mr. Greene asserts that he is entitled to summary judgment regarding a claimed Schedule C deduction. (*Id.* at 7). Fourth, Mr. Greene alternatively argues that any tax paid by MDG because it reported the $888,496.75 as corporate income should be credited under the doctrine of "equitable recoupment" towards Mr. Greene's personal tax liability if the income is ultimately attributed to him. (*Id.* at 9). Finally, Mr. Greene alternatively asserts that certain deductions noted in the IRS's work-papers were not applied against the deficiency amount. (*Id.* at 8–9). The Court will analyze each argument in turn.

### A.  IRS Examination

Mr. Greene first contends that because the "IRS records post audit reflect AGI of [negative] $493,879 (net loss) and Taxable Income of $0.00 . . . [the United States] is without lawful basis to determine a tax deficiency on the $0.00 Taxable Income and that an overpayment exists." (*Id.* at 5–6). Thus, Mr. Greene appears to challenge the method of tax reconstruction applied by the IRS.

In response, the United States explains that the IRS applied a "bank deposit analysis" to reconstruct Mr. Greene's personal income for the 1990 tax year. (Doc. 43 at 6–7). According to the United States, this method "assumes that all money deposited into a taxpayer's bank account, and cash expenditures from money that was not deposited into the taxpayer's bank account, constitutes taxable income." (*Id.*) During its examination, the United States reviewed accounts held by Mr. Greene in the names of other entities owned by Mr. Greene and affiliated with MDG. (*Id.* at 7); *see* (Doc. 46-2 at 1–56).[1] After reviewing the bank accounts of MDG's "subdivisions," the IRS designated several deposits as "sales commissions" and attributed the money as Mr. Greene's personal income. (Doc. 43 at 7).

### 1.  Legal Standard

If a taxpayer fails to maintain and produce the required books and records to prove income, the IRS may determine the taxpayer's income by any method that "clearly reflect[s] income." 26 U.S.C. § 446(b); *see Petzoldt v. Comm'r*, 92 T.C. 661, 693 (1989). The IRS's reconstruction of income "need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt*, 92 T.C. at 687. The bank deposits method has long been considered a permissible method of reconstructing income. *See e.g.*, *Kudo v. Comm'r*, 76 T.C.M. (CCH) 817 (1998), *aff'd in unpublished opinion*, 11 F. App'x 864

---

[1] Mr. Greene testified that MDG had six "identical" "subdivisions" with separate bank accounts in order to effectively conduct business. *See* (Doc. 45-1 at 9–11). The subdivisions were not incorporated; did not have officers, employees, or shareholders; and were simply additional bank accounts with sole signatory authority residing in Mr. Greene. (*Id.* at 11).

(9th Cir. 2001); *Cox v. Comm'r*, 105 T.C.M. (CCH) 1466 (2013) (citing *Clayton v. Comm'r*, 102 T.C. 632, 645 (1994)); *Langille v. Comm'r*, 99 T.C.M. (CCH) 1197 (2010), *aff'd*, 447 F. App'x 130 (11th Cir. 2011). After the IRS reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the IRS's use of the bank deposits method is unfair or inaccurate. *See Clayton*, 102 T.C. at 645.

The tax code defines gross income as "all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, fringe benefits, and similar items; (2) Gross income derived from business; (3) Gains derived from dealings in property; (4) Interest; (5) Rents." 26 U.S.C. § 61(a). The definition is broadly construed and extends to all realized accessions to wealth over which the taxpayer has complete control. *See Comm'r v. Glenshaw Glass Co.*, 348 U.S. 426, 431 (1955). Thus, a gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." *Rutkin v. United States*, 343 U.S. 130, 137 (1952).

Accordingly, when the IRS reconstructs a taxpayer's income using the bank deposits method, the IRS may include in gross income "deposits into all accounts over which the taxpayer has dominion and control, not just deposits into the taxpayer's personal bank accounts." *Chambers v. Comm'r*, 101 T.C.M. (CCH) 1550 (2011); *see e.g.*, *United States v. Goldberg*, 330 F.2d 30, 38 (3d Cir. 1964); *Davis v. United States*, 226 F.2d 331, 334–35 (6th Cir. 1955); *Price v. Comm'r*, 87 T.C.M. (CCH) 1239 (2004); *Cohen v. Comm'r*, 85 T.C.M. (CCH) 861 (2003). A taxpayer has dominion and control when the taxpayer is free to use the funds at will. *See Rutkin*, 343 U.S. at 137.

### 2.    Analysis

Mr. Greene did not present the Court with any evidence showing that he maintained adequate books and records with respect to his income for tax year 1990. *See Petzoldt*, 92 T.C. at 693. In the absence of such evidence, the Court finds that it was reasonable for the IRS to use an indirect method, i.e., the bank deposits method, to reconstruct Mr. Greene's income for that tax year. Accordingly, Mr. Greene bears the

burden of proving that the IRS's determinations were unfair or inaccurate. *See Clayton*, 102 T.C. at 645.

In this regard, Mr. Greene's sole argument is that the deposits into the MDG bank accounts do not constitute taxable income to him because MDG declared the deposits as income on its corporate tax return. (Doc. 38 at 6). As stated above, however, it is appropriate for the IRS to include in gross income deposits made into bank accounts over which the taxpayer has control. *See Chambers*, 101 T.C.M. (CCH) 1550. Here, Mr. Greene undisputedly had singular control over the bank accounts of MDG's "subdivisions." *See* (Doc. 45-1 at 9–11). Consequently, there is a disputed issue of material fact as to whether the IRS erred by including those accounts as Mr. Greene's personal income and summary judgment on this issue will be denied.[2]

In an ancillary matter, the United States again argues that the assessment tracked in NMF 1 is not properly before the Court because NMF 1 has not yet been fully paid. (Doc. 43 at 5). As expressed earlier in this case, the Court agrees. *See* (Doc. 19 at 8) ("In sum, the Court finds the alleged facts sufficient to give it subject matter jurisdiction over the NMF 2 tax refund overpayment claim."). The Court also agrees with the United States that "while there are two assessments, there is only one actual tax liability for the tax year 1990," (Doc. 43 at 4–5), and stated as much in its prior Order, *see* (Doc. 33 at 4) ("While the Court agrees with the general assertion that the two assessments can be added together to reach Plaintiff's 'total' tax liability for 1990, the Court's jurisdiction over this case remains."). Lest any ambiguity linger, should Mr. Greene prevail in this

---

[2] To the extent Mr. Greene seeks summary judgment due to the NMF 2 account showing a "taxable income" of $0.00, the motion is denied. According to the IRS's work-papers, the Greenes' 1990 "taxable income" was $973,999.00, (Doc. 46-1 at 20), and there is no dispute that the IRS tracked the corresponding tax deficiency in two separate accounts, *see* (Docs. 38 at 2; 44 at 9–10; 46-1 at 53; 47 at 7). Although the documents Mr. Greene presents to the Court may display a "taxable income" of $0.00, they also include an "Assessment, Other Debits (Reversal)" section listing the deficiency value tracked in NMF 2. *See* (Doc. 39 at 29). Mr. Greene has not met his burden of showing he is entitled to summary judgment on this issue. *See Celotex*, 477 U.S. at 522.

lawsuit he will *only* be entitled to overpayments regarding the account that has been paid in full, NMF 2.[3] To the extent the United States believes this fact prohibits Mr. Greene from arguing that the IRS examination was erroneous, the Court does not agree. The IRS examination concluded that $888,496.75 deposited in the bank accounts of MDG's "subdivisions" and disclosed on MDG's corporate tax return should be attributed to Mr. Greene as personal income. The IRS subsequently assessed a $269,830.00 tax deficiency and tracked the deficiency in two separate assessment accounts. Because the deficiency assessment tracked in NMF 2 arose from the IRS examination's findings, Mr. Greene has the right to challenge those underlying findings. The result of this case will nonetheless apply *only* to the assessment tracked in NMF 2. If Mr. Greene prevails here and seeks to challenge the assessment tracked in NPF 1, he must do so in a separate action.[4]

**B.      Designation of $888,496.75 as "Sales Commission" Income**

During its examination, the IRS determined that $888,496.75 in "sales commissions" deposited in the bank accounts of MDG's "subdivisions" and disclosed on MDG's 1990 corporate tax return should have been declared by Mr. Greene on his personal return. (Docs. 39 at 34; 42 at 1; 44 at 2–3). Mr. Greene contends this determination was erroneous and moves for summary judgment because he believes that the income was properly included on MDG's corporate tax return. (Doc. 38 at 6–8). The crux of Mr. Greene's argument is that "[t]he $888,497 deposits was not income to plaintiff," because that income was "reported in MDG Inc.'s 1990 tax return" and the "United States knew prior to the [IRS examination] that the $888,497 deposits were reported in MDG Inc.'s 1990 tax return." (*Id.* at 7).

In response, the United States asserts that a disputed issue of material fact exists as

---

[3] As the United States observes, the IRS may be able to "offset payments or withhold amounts to attempt to satisfy," (Doc. 43 at 5), other debts Mr. Greene may owe the United States. *See* 26 U.S.C. § 6402.

[4] The Court makes no decision as to whether this case will have collateral estoppel or *res judicata* applicability in a subsequent lawsuit. Nor does the Court comment on what court is proper for such litigation.

to whether the $888,496.75 should be attributed to Mr. Greene as personal income or to MDG as corporate income. (Doc. 43 at 8–11). The United States contends that Mr. Greene incorporated MDG as a conduit to illegally funnel money and conceal income. (*Id.*) Specifically, the United States argues that Mr. Greene "created other business entities into which he paid additional income to himself, but which income was disguised as being purchases by Greene's coupling business, and income to his other personal businesses, but not reported as personal income to Greene on his personal income tax returns." (Doc. 44 at 14). According to the United States, "Mr. Greene used MDG, Inc. as a nominee entity by writing checks from one entity he controlled to another in attempt to obscure his income." (*Id.* at 2).[5] To support this argument, the United States presents the testimony of Mr. Greene's former brother-in-law, Robert Michael Scott, who testified that Mr. Greene told him to "create certain personal businesses—business entities into which additional income could be paid as commissions, disguised as purchases by Greene's coupling business, but not reported by Scott as income on his, Scott's personal income tax return." (Doc. 43 at 9). Mr. Scott further testified that Mr. Greene created other business entities through which Mr. Greene paid income to himself but did not report the income as personal income. (*Id.* at 9–10).

The Court finds that a disputed issue of material fact exists as to the proper allocation of the $888,496.75 in income. Specifically, there is a disputed issue of material fact as to whether Mr. Greene maintained MDG[6] and its "subdivisions" as entities through which to funnel and conceal income in lieu of disclosing the income on his personal income tax return. Mr. Scott's testimony coupled with the fact that MDG's six

---

[5] Although the United States does not expressly explain the "nominee" relationship concept, it does state that "[t]he use of multiple entity names and multiple bank accounts wherein Mr. Greene was doing business as one entity engaging with another entity owned and operated by himself, over all of which Mr. Greene had sole signature authority, but with no real distinguishable business purpose or necessity, was a factor in imputing the income from these entities to Mr. Greene personally." (*Id.* at 9).

[6] The "MDG" in "MDG, Inc." stands for Michael Don Greene. (Doc. 45-1 at 6).

"subdivisions" were mere bank accounts with no distinguishable business purpose, corporate form, officers, or shareholders could be interpreted by a "reasonable jury" as a method of funneling and concealing income. *See Liberty Lobby*, 477 U.S. at 248. The Court will therefore deny summary judgment on this issue. *See Watts*, 703 F.2d at 348.

### C.   Schedule C Business Expense Deduction

Mr. Greene also moves for summary judgment as to a $15,697.00 "Horse – Racing Stock" deduction that he claimed as a Schedule C business expense, *see* (Doc. 46-1 at 9), but that the IRS denied, *see* (Docs. 38 at 6–8; 46-1 at 43). In this regard, Mr. Greene contends that he "engaged in the Schedule C business to make a profit," was "actively involved with the operations in good faith to make a profit," and that "his loss in the horse racing business, Schedule C, is not determinative of his intent to make a profit." (Doc. 38 at 7–8).

In response, the United States contends that a disputed issue of material fact exists as to Mr. Greene's intent for this activity. (Doc. 43 at 11–14). The United States explains that Mr. Greene did not provide the IRS with any record evidence of his horse-racing activities, nor does he set forth any evidence in this action to show that his intention was to earn a profit. (*Id.*)

### 1.   Legal Standard

It is a "familiar rule" that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. Comm'r*, 503 U.S. 79, 84 (1992) (citations omitted); *see Davis v. Comm'r*, 394 F.3d 1294, 1298 (9th Cir. 2005) ("[T]he taxpayer bears the burden of showing that he or she meets every condition of a tax exemption or deduction."). Thus, "[i]t is the taxpayer's burden to substantiate claimed deductions" with "sufficient evidence to support a deduction." *Maciel v. Comm'r*, 489 F.3d 1018, 1028 (9th Cir. 2007) (citing *Boyd Gaming Corp. v. Comm'r*, 177 F.3d 1096, 1098 (9th Cir. 1999)). To that end, a taxpayer is required to "keep such records, render such statements, make such returns, and comply with such rules and regulations . . . as the Secretary deems sufficient

1  to show whether or not such person is liable for tax under this title." 26 U.S.C. § 6001.

2  "If evidence to establish a deduction is lacking, the taxpayer, not the government, suffers

3  the consequences." *Talley Indus. Inc. v. Comm'r*, 116 F.3d 382, 387–88 (9th Cir. 1997).

4         According to the tax code, certain "ordinary and necessary expenses" for "trade or

5  business" activities may be deducted by a taxpayer. 26 U.S.C. § 162(a). "The standard

6  test for the existence of a trade or business for purposes of § 162 is whether the activity

7  was entered into with the dominant hope and intent of realizing a profit." *United States v.*

8  *Am. Bar Endowment*, 477 U.S. 105, 110 n.1 (1986); *see Indep. Elec. Supply, Inc. v.*

9  *Comm'r*, 781 F.2d 724, 726 (9th Cir. 1986) ("[T]he primary inquiry when determining

10  whether a particular activity constitutes a trade or business is to ask whether the activity

11  was undertaken or continued in good faith, with the dominant hope and intent of realizing

12  a profit, i.e., taxable income, therefrom." (quotation omitted)). The Treasury Regulations

13  catalogue a non-exclusive list of nine factors to consider when determining whether an

14  activity is engaged in for profit:

15         (1) Manner in which the taxpayer carries on the activity.
          (2) The expertise of the taxpayer or his advisors.
16         (3) Time and effort expended by the taxpayer in carrying on the activity.
          (4) Expectation that assets used in activity may appreciate in value.
17         (5) Taxpayer's success in carrying on other similar or dissimilar activities.
          (6) The taxpayer's history of income or losses with respect to the activity.
18         (7) The amount of occasional profits, if any, which are earned.
19         (8) The financial status of the taxpayer.
          (9) Elements of personal pleasure or recreation.
20

21  *See* 26 C.F.R. 1.183-2(b). Ultimately, the taxpayer bears the burden of proving that his

22  primary purpose was to derive a profit from the activity. *Skeen v. Comm'r*, 864 F.2d 93,

23  94 (9th Cir. 1989).

24                              **2.    Analysis**

25         The Court finds that Mr. Greene has not satisfied his burden of showing that he is

26  entitled to summary judgment on his claimed Schedule C deduction. Although it is

27  undisputed that Mr. Greene owned and raced a two-year old horse, *see* (Docs. 38 at 7; 43

28  at 14), Mr. Greene presents little to no evidence as to the factors itemized by the Treasury

1    Regulations to show his intent, nor does he set forth any records of his horse-racing
2    activities to substantiate his alleged expenses. Although Mr. Greene claims that such
3    records existed at one time, *see* (Docs. 39 at 56; 47 at 4), the only evidence before the
4    Court is Mr. Greene's unsubstantiated claim that he was engaged in horse-racing for a
5    profit. Given that it is a taxpayer's burden to prove all elements of a claimed deduction,
6    *see Skeen*, 864 F.2d at 94, the Court finds that Mr. Greene's unsubstantiated statements
7    alone are not enough for the Court to hold that Mr. Greene is entitled to the deduction as
8    a matter of law and will therefore deny summary judgment on this issue, *see Celotex*, 477
9    U.S. at 322 ("[A] party seeking summary judgment always bears the initial responsibility
10   of informing the district court of the basis for its motion . . . .").

11          **D.    Alternative Arguments**

12                 **1.    "Equitable Recoupment"**

13          As an alternative argument, Mr. Greene requests summary judgment that the
14   partial payment made by MDG for its 1990 tax liability should offset his personal tax
15   liability if the $888,496.75 is attributed to him. (Doc. 38 at 9). According to Mr. Greene,
16   MDG made $68,470.00 in income tax payments that would not have been paid had the
17   $888,496.75 been declared by Mr. Greene on his personal tax return rather than on
18   MDG's corporate return. (*Id.*) Thus, Mr. Greene asserts that if the Court rejects his
19   primary argument and finds that the IRS appropriately attributed the $888,496.75 to him,
20   his personal tax liability for the 1990 tax year should be credited $68,470.00 "by reason
21   of equitable recoupment." (*Id.*)

22          In response, the United States claims that the $68,470.00 was a "voluntary"
23   payment on behalf of MDG and was applied as directed by Mr. Greene. (Doc. 43 at 14).
24   According to the United States, because Mr. Greene paid $68,470.00 for MDG and
25   designated the money as payment towards MDG's 1990 tax liability, the payment was
26   "voluntarily" made and Mr. Greene should not be credited that amount.[7]

27   _____

28          [7] The parties do not explain whether Mr. Greene paid the $68,470.00 out of his
     own personal funds or if he paid on behalf of MDG with MDG's funds. During his

### a.   Legal Standard

Generally, a taxpayer who paid a tax that was not owed may sue for a refund under 26 U.S.C. § 7422. Nonetheless, "[i]n some circumstances, a taxpayer may be time barred from seeking a refund of an erroneous tax, but the IRS can still bring a timely suit for payment of the correct tax." *Estate of Branson v. Comm'r*, 264 F.3d 904, 909 (9th Cir. 2001). In this situation, the doctrine of "equitable recoupment" may be raised as a defense to the statute of limitations. *Id.* The doctrine is designed to protect a party from paying twice on a single obligation, *see Bull v. United States*, 295 U.S. 247, 258 (1935), but cannot be used offensively to obtain a money payment, only defensively to offset an adjudicated deficiency, *see United States v. Dalm*, 494 U.S. 596, 611 (1990). In other words, the doctrine "prevents unjust enrichment and works as a setoff when invoked by the taxpayer to recover taxes paid twice[.]" *Parker v. United States*, 110 F.3d 678, 682 (9th Cir. 1997).

Because equitable recoupment overcomes the statute of limitations, the party seeking to invoke the doctrine must show the following criteria:

> First, the same transaction, item or taxable event must be subject to two taxes. Second, the taxes must be inconsistent in that the Tax Code authorizes only a single tax. Third, the tax sought to be recouped must be time barred. Fourth, there must be an identity of interest between the parties paying the duplicative tax.

> Finally, the court in which the recoupment claim is brought must independently have jurisdiction to adjudicate the claim. Equitable recoupment cannot be the sole basis of jurisdiction.

*Estate of Branson*, 264 F.3d at 909–10 (internal citations and quotations omitted).

### b.   Analysis

As the party seeking summary judgment on this issue, Mr. Greene bears the burden of proving that he is entitled to equitable recoupment. In his briefing, however, Mr. Greene does not discuss any of the elements necessary to invoke equitable

___

deposition, Mr. Greene noted that it was his handwriting on the checks, *see* (Doc. 39 at 57), but the checks are not found in the record.

- 13 -

recoupment or point to any record evidence.[8] Of course, it is undisputed that (1) the $888,496.75 in income was reported by MDG as income on its 1990 corporate tax return,[9] (2) the IRS processed MDG's 1990 tax return, (3) Mr. Greene paid and the IRS accepted $68,470.00 as partial payment for MDG's 1990 tax liability, and (4) the IRS claims that the $888,496.75 should have been included on Mr. Greene's personal tax return for 1990, not MDG's corporate return. Thus, the IRS has received nearly $70,000.00[10] in taxes on income it now attributes to a different taxpayer but claims that it need not credit that amount to the taxpayer because the $70,000.00 was a "voluntary" contribution to the government.[11] Nonetheless, because Mr. Greene presents no evidence

---

[8] The Court does not consider any arguments made by Mr. Greene for the first time at oral argument. *See e.g.*, *United States v. Halling*, 232 F. App'x 692, 693 (9th Cir. 2007); *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992).

[9] The United States notes that MDG never fully paid its 1990 corporate tax liability. (Doc. 43 at 8–9). However, the record reveals that whatever money MDG owed the United States was written-off on January 5, 2004. *See* (Doc. 46-2 at 78–78). Thus, the current balance owed by MDG is $0.00. (*Id.*)

[10] Although the United States trivialized this amount during oral argument, $68,470.00 is certainly not a small figure.

[11] The United States pointedly comments that Mr. Greene pled guilty in the District of Oklahoma in 1996 for filing a false tax return for the 1990 tax year but now seeks a refund for that same tax year. (Doc. 43 at 10). At that time, the United States clearly understood the "weaknesses" of its criminal case against Mr. Greene and the possibility that an equitable recoupment-type argument could be raised. As stated by the United States Attorney's Office:

> Additionally, and more importantly, this case is not without its own weaknesses which would have to be dealt with and overcome at trial. *The very same income which the IRS alleges in the criminal investigation was not reported on the original income tax returns was later reported on 'consolidated' corporate returns of MDG, Inc. These corporate tax returns were accepted by the IRS as filed and the tax due was assessed and partially collected by a revenue officer.* And, the outstanding liabilities were the subject of an offer-in-compromise with the Appeals Division of the IRS. The extensive, unusual, and seemingly inconsistent, civil

or authority to support any of the elements needed to invoke equitable recoupment, the Court will deny summary judgment on this issue.[12]

### 2.  MDG's Business Expense Deductions

Mr. Greene also makes the alternative argument that certain deductions noted in the IRS's work-papers should have been applied against the assessed deficiency. (Doc. 38 at 8–9). Specifically, Mr. Greene contends that deductions for the cost of goods in the amount of $186,569.00, expenses in the amount of $5,301.00, and depreciation in the amount of $350,145.00 should have reduced the assessed deficiency. (*Id.* at 9).

In response, the United States asserts that Mr. Greene has not satisfied his burden of proof because he has not provided any evidence to substantiate the three claimed deductions. (Doc. 43 at 14).

The IRS work-papers to which Mr. Greene refers simply itemize the cost of sales and related expenses that MDG claimed it incurred during 1990. *See* (Doc. 39 at 30–31). As explained above, Mr. Greene has the burden of providing sufficient evidence to substantiate claimed deductions. *See Davis*, 394 F.3d at 1298. Here, the work-papers— the only evidence before the Court—do not prove that Mr. Greene is entitled to the deductions he seeks. Thus, the Court will deny summary judgment on this issue.

---

involvement in this case would certainly 'muddy the waters' and create a substantial risk of conviction in a criminal trial.

Playing the devil's advocate, it would seem that the civil involvement would open the door to the argument that the government is now trying to convict a man for the crime of not reporting income which was reported to the IRS and which the IRS has previously accepted as being property declared, reported, assessed and partially paid and where efforts have been made by the IRS to collect the balance. Or, in other words, since the government hasn't been able to collect the balance from Mr. Greene with its civil process, it now wants a jury to convict him of a crime.

(Doc. 39 at 37) (emphasis added).

[12] On the record before it, the Court makes no determination as to whether it has jurisdiction to adjudicate Mr. Greene's equitable recoupment argument.

1

**IV.      Conclusion**

2

For the foregoing reasons,

3

**IT IS ORDERED** that Mr. Greene's Motion for Summary Judgment (Doc. 41) is

4

**DENIED**.

5

Dated this 26th day of April, 2016.

6

7

8

9

James A. Teilborg
Senior United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28